# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| SHARIDAN STILES, et al., | Case No. 1:20-mc-002 |
| Plaintiffs, | Dlott, J. |
| | Bowman, M.J. |
| v. | |
| WALMART INC., et al., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

This miscellaneous case was filed on January 22, 2020 by the Procter & Gamble Company ("P&G"), a non-party to an underlying lawsuit that Plaintiffs Sharidan Stiles and Stiles 4 U are pursuing in the Eastern District of California. *See, e.g., Stiles v. Wal-Mart Stores, Inc.*, Case No. 2:14-cv-2234-MCE-CMK ("the CA case"). P&G has filed a motion to quash a subpoena to testify at a Rule 30(b)(6) deposition. For the following reasons, P&G's motion will be granted in part and denied in part.

    **I.**    **Background of the California Case**

In order to provide context for the discovery sought from P&G, the undersigned must review the matters in dispute in the underlying CA case. Plaintiffs filed this lawsuit in September 2014 in the Eastern District of California against Defendants Walmart and American International Industries ("AI"). In an order filed on January 17, 2020 attached

as an exhibit to Plaintiffs' opposition to the pending motion,[1] the trial court briefly summarized the CA case as follows:

> [P]laintiffs claim Stiles is the inventor of the Stiles Razor, a narrow-width-blade razor used for "detailed shaving applications." *See e.g.* ECF No. 284, pg. 12. In 2003, Stiles began courting Walmart as a potential buyer of the Stiles Razor. *See id.* Ultimately, Walmart agreed to a test run of the Stiles Razor, which was successful. *See id.* Walmart places the Stiles Razor in about 2,000 Walmart stores and sales were outstanding. *See id.* Defendants, however, colluded with plaintiffs' competitors and used its market power to eliminate the Stiles Razor from the market in favor of a knock-off version of the Stiles Razor.

(Doc. 17-3 at 58). Plaintiffs further allege that the referenced knock-off version was manufactured by Defendant AI at Defendant Walmart's request. (FAC at ¶ 58).

All fact discovery other than depositions closed on January 10, 2020.[2] Initially, Plaintiffs were granted leave to take up to 18 depositions but were directed to complete those depositions within a few short weeks. However, the deadline for depositions has been extended several times. In light of the coronavirus pandemic and current travel restrictions, the deadline for the completion of four remaining depositions (including the subpoena issued to P&G) has been extended through May 22, 2020. (CA case, Doc. 433, Jt. Stipulation of 4/9/20).

---

[1] Plaintiffs have attached several of the California trial court's orders as exhibits to their response, as well as a copy of their Fourth Amended Complaint. For a more complete understanding of the underlying litigation, the undersigned has reviewed and cited additional materials filed in the docket of that case. The designation "CA case" precedes any references to the cm/ecf docket numbers in the underlying case. References to docket numbers without a citation to the CA case are to the docket of this Court. Plaintiffs filed a "public" (heavily redacted) version of their response in opposition (Doc. 14) as well as a less-redacted version under seal. (Doc. 17). Although the undersigned has cited to the sealed version, all of the same citations appear in the publicly filed version except as noted below in FN 9.

[2] The trial court made clear that the January 10, 2020 deadline will not be further extended. In an order filed on February 6, 2020, the court denied Plaintiffs' motion to compel AI to supplement its discovery responses because Plaintiffs did not file their motion to compel until after the January 10 deadline.

According to the operative Fourth Amended Complaint ("FAC"), the Stiles Razor is designed for detailed shaving of unique areas of the body such as eyebrows, scalp art, and sideburns.  After the initial trial, Plaintiffs began selling the Stiles Razor in Walmart stores in 2006, and continued to sell in Walmart's "Wet Shave" Department until 2009.  After the discontinuance of sales in the Wet Shave Department, Plaintiffs continued to sell the Stiles Razor in Walmart's Beauty Department until May 2012, when Walmart ceased all sales of Plaintiffs' product.

On August 31, 2017, the trial court initially granted the Defendants' motions to dismiss two antitrust claims.  (CA case, Doc. 101).  However, after Plaintiffs submitted new evidence in support of reconsideration of that ruling, the court granted leave to file a Fourth Amended Complaint that reasserted the "rule of reason" antitrust claims.  On March 29, 2019, the same court denied the Defendants' motion to dismiss the restated antitrust claims.  (CA case, Doc. 188).  In the latter Order, the court noted that Plaintiffs have alleged that Walmart is a dominant buyer and that AI is the largest manufacturer of personal styling razors, and that "[t]ogether , Defendants Walmart and AI control 98% of the disposable styling razor market." (*Id*. at 3).  The court allowed the re-alleged "rule of reason" antitrust claims based upon evidence that "tended to show that Plaintiff had attempted to enter the market through other retailers" after Walmart discontinued sales but was rejected based upon the prior "failure" of her product at Walmart, which failure allegedly was engineered by the Defendants.  (*Id*. at 5; *see also* FAC at 3, n.1, confirming claims are "rule of reason" claims).

Consistent with earlier versions of the complaint, the FAC alleges that AI's Ardell Brow Precision Shaper infringes on the Stiles Razor and that Walmart entered into an agreement with AI in 2011 to sell their Ardell Brown Precision Shaper razor under Walmart's store brand, Salon Perfect. Walmart began to sell the Salon Perfect Micro Razor in 2013. In all, the FAC includes seven causes of action: (1) Violation of the Sherman Act, 15 U.S.C. § 1; (2) Violation of California's Cartwright Antitrust Act; (3) and (4) Patent infringement (referencing two separate patents); (5) dress infringement in violation of the Lanham Act; (6) false advertising and false association in violation of the Lanham Act (against Walmart alone); and (7) intentional interference with prospective economic advantage (against AI alone).

On November 19, 2019, the California court denied Plaintiffs' motion for "joinder" which the court construed as a motion to file a fifth amended complaint to assert new "horizontal conspiracy" Sherman Act antitrust claims[3] and to add three new defendants: alleged to be "category advisor" companies to Walmart. The proposed defendants were Coty, Inc., Pacific World Corporation, and P&G. The trial court denied Plaintiffs' motion under Rule 16(b) based upon its pre-existing scheduling order and Plaintiffs' failure to show "good cause" for the untimely addition of new claims and defendants.

The California record reveals a contentious discovery battlefield, with the trial court issuing numerous rulings in favor of both sides on various issues. In December 2019,

---

[3] The proposed new "*per se*" Sherman Act violations against the newly proposed defendants differ from the existing "rule of reason" Sherman Act claims.

4

Plaintiffs sought leave to take in excess of 10 depositions based upon the complexity of the litigation, initially listing 13 potential depositions but later expanding that number to 18. Although most of the depositions were of representatives of Defendants, several of the proposed depositions were of non-parties including the Rule 30(b)(6) deposition of P&G. In a brief order, the trial court agreed that the litigation was "complex" and found that Plaintiffs had made "the necessary showing as to the 18 deponents listed," thereby granting the motion to take excess depositions. (Doc. 17-3 at 65, 1/17/20 Order). The order contained no other substantive discussion and was silent as to the relevant scope of the depositions of non-parties.[4]

Two subsequent orders also relate to the number of depositions sought by Plaintiffs. After initially allowing Plaintiffs up to 18 depositions, the California court held a hearing on February 5, 2020 to address a dispute over Plaintiffs' attempt to depose two individuals not included on their list of 18. The transcript of that hearing and subsequent order make clear that the court was less concerned with *who* Plaintiffs wished to depose than with holding the number to 18. Thus, the February 6 order instructed Plaintiffs that they could substitute other deponents in place of those previously listed so long as they did not exceed 18 depositions. (CA. case, Doc. 360; Doc. 17-3 at 121).

---

[4]Plaintiffs suggest that, in its January order granting Plaintiffs' motion for leave to take excess depositions, the trial court rejected all arguments concerning the proposed scope of the excess depositions for all proposed deponents. (Doc. 17 at 12-13). Plaintiffs infer too much based upon the mere inclusion of arguments by Walmart in a 61-page pre-hearing memorandum that spanned *many* issues. The undersigned finds no evidence that the trial court either implicitly or explicitly considered the specific arguments from non-party P&G's perspective either in the initial order granting leave to take excess depositions (where the focus was on the *number* of depositions), or in any subsequent orders.

5

At the same February 5 hearing, Walmart raised objections about the scope of the 32 topics listed in the Rule 30(b)(6) deposition that Walmart was being asked to provide, including general topics of inquiry about Walmart's "category advisor" program. The trial court partially rejected Walmart's arguments that the topics were overbroad, subject to a narrowing of the time periods and to the "Wet Shave" and "Beauty" departments in which the Stiles Razor had been sold by Walmart.

In a third order filed March 6, 2020, the trial court again addressed the number of depositions. Because Plaintiffs had served 20 Notices rather than the limit of 18, the March 6 Order instructed Plaintiffs to withdraw two Notices. (Doc. 17-3 at 438). Plaintiffs complied in part by withdrawing a Rule 30(b)(6) Notice of Deposition it had served upon non-party Coty, after that entity moved to quash the subpoena in the Southern District of New York.[5]

## II. The Subpoena Issued to Non-party P&G

On January 8, 2020, Plaintiffs served P&G with a subpoena that failed to include witness fees as mandated by Rule 45, Fed. R. Civ. P. On February 5, 2020, after P&G moved to quash the subpoena based upon the failure to include fees, Plaintiffs served counsel for P&G with a second subpoena that was identical to the first but that included

---

[5] *See Stiles v. Walmart*, 1:2020mc0047 (S.D.N.Y). The grounds presented by Coty in its motion to quash were similar to those presented by P&G. Notably, Plaintiffs responded with virtually identical arguments as those made here against P&G, asserting that Coty was "not some fringe player" but was "at the center" of an alleged "cartel." After Plaintiffs withdrew the subpoena, Coty alerted the court that its motion to quash could be denied as moot. A Coty employee, Robin Foshee, successfully moved to quash a separate subpoena issued to her in the Western District of Arkansas. However, the parties recent Joint Stipulation suggests that Plaintiffs may yet take Ms. Foshee's deposition. *See Stiles v. Walmart*, 5:20-mc-00020 (W.D. Ark) (quashing subpoena); *but see* CA case, Doc. 433.

the requisite fees. The second subpoena sought the deposition of P&G's corporate representative a mere nine days after service upon counsel, on February 14, 2020.[6]

### A. P&G's Procedural Arguments are Unpersuasive

Plaintiffs concede that their first subpoena was procedurally deficient based upon their failure to include witness fees. (*See* Doc. 17 at 14, conceding that "Plaintiffs served the Subpoena a second time to cure the purported deficiency regarding the tendering of witness fees."). However, as P&G is quick to point out, Plaintiffs committed a different procedural error when they served the second subpoena not on P&G directly as required by Rule 45, but instead on P&G's counsel through delivery to a receptionist at Dinsmore & Shohl LLP on February 5, 2020. P&G complains that service on counsel is valid only for represented parties, not for non-parties. Although Plaintiffs had been in contact with P&G's counsel by phone and by email, Plaintiffs did not confirm that counsel would accept service on his client's behalf prior to delivering the copy of the second subpoena with the witness fees. Finally, P&G argues that the subpoena should be quashed based upon the overly short time for compliance.

Plaintiffs urge this Court to overlook any procedural defects. They maintain that service on counsel was proper and that the second subpoena "cured" the procedural deficiency of the Plaintiffs' failure to include witness fees with the first subpoena. Despite

---

[6]The short deadline appears to have been set in order to complete the Rule 30(b)(6) deposition within a then-existing mid-February deadline. As noted, the deadline for the completion of depositions was subsequently extended and currently stands at May 22, 2020.

7

the lack of citation to any relevant authority, the undersigned finds Plaintiffs' position to be persuasive on the whole.

The first subpoena was a nullity due to the absence of fees, while the second subpoena stands on its own. Despite the technically deficient service, the interests of justice do not support quashing the second subpoena under the circumstances presented here, where counsel were in close communication and service was received. If the court were to quash the subpoena, it would be without prejudice to Plaintiffs to reissue a third subpoena that complies with all procedural requirements and allows additional time for compliance. As another magistrate judge in this Court explained, there is no merit in quashing a subpoena on such grounds when the goals of the Rule have been satisfied and substantive issues have been fully briefed:

> [T]he goal behind the Rule–that the other party will have an opportunity to object before production–has been met in this case. Mr. Streb himself admitted in his original motion that he was called and made aware of these subpoenas and given the chance to receive copies…. Thus, it would be a waste of the resources for all parties involved to require Defendants to withdraw and refile their subpoenas in accordance with Fed. R. Civ. P. 45

*Mullins v. U.S. Bank*, 2006 WL 8445564 at *3 (S.D. Ohio Dec. 6, 2006).

For the same reason, the undersigned will not quash the subpoena based upon the short time frame. Though the time frame for compliance was overly short, it is the general practice of the undersigned to require parties to meet and confer to reschedule any deposition on a mutually agreeable date rather than to quash a subpoena in its entirety.

### B. P&G's Substantive Arguments Are More Persuasive

P&G's arguments that the subpoena should be substantially narrowed or quashed on the merits, based upon relevance to Plaintiff's claims, overbreadth and undue burden to P&G as a non-party, are more persuasive.

As the moving party, P&G has the burden to prove to this Court that complying with the subpoena will subject it to an "undue burden," s*ee* Fed. R. Civ. P. 45(c)(3); *Baumgardner v. Lousiana Binding Serv.,* No. 1:11cv794, 2013 U.S. Dist. LEXIS 27494, at *4, 2013 WL 765574 (S.D. Ohio Feb. 28, 2013).  However, this Court retains the discretion "to limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce.'"  *Surles ex rel. Johnson v. Greyhound Lines, Inc.,* 474 F.3d 288, 305 (6th Cir. 2007). "The scope of discovery under a subpoena is the same as the scope of discovery under Rule 26 ." *Hendricks v. Total Quality Logistics,* 275 F.R.D. 251, 253 (S.D. Ohio 2011).

> In considering whether the discovery sought is unduly burdensome, the Court considers whether "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii); *Surles,* 474 F.3d at 305 (same). In addition, "the status of a person as a non-party is a factor that weighs against disclosure."

*Vietnam Veterans of America v. C.I.A.*, 2011 WL 4714000, at *5 (S.D. Ohio 2011) (citing *American Elec. Power Co., Inc. v. U.S.,* 191 F.R.D. 132, 136 (S.D. Ohio 1999) (additional citations omitted)).

9

**1. The Topics in the Subpoena**

The scope of the Rule 30(b)(6) subpoena is undeniably broad. In the subpoena, Plaintiffs ask P&G to prepare a corporate representative to testify about an astonishing level of detail concerning 10 topics that span a time period of nearly 8 years. For the convenience of the Court, nine of those topics are restated herein.[7]

> 1. Communications between You and Walmart from January 1, 2007, to October 1, 2014, regarding any price, cost, add/delete/carryover decision, rollback, promotions, or store count for products in the Wet Shave Category.
>
> 2 Communications between You and any Walmart Category Advisor for the Wet Shave Category (including but not limited to Energizer) from January 1, 2007, to October 1, 2014, regarding any price, cost, add/delete/carryover decision, rollback, or store count for products in that Category.
>
> 3. Your role and the nature and extent of Your participation as a Walmart Category Advisor for the Wet Shave Category during the period of January 1, 2007, to October 1, 2014, including but not limited to:
>     a. Setting prices for products in that Category;
>     b. Analyzing historical, present, and future pricing data in that Category (including costs, profit margins, and competitor pricing);
>     c. Marketing products in that Category;
>     d. Determining the stock levels, additions, deletions, carryover, and store placement for products in that Category;
>     e. Running promotions for products in that Category;
>     f . The information exchanged between You and Walmart as part of your service as a category advisor;
>     g. Your actions taken or recommendations made as a category advisor to Walmart; and
>     h. The terms for your service as a category advisor to Walmart,
>
> 4. Your role and the nature and extent of Your participation as a category advisor to any retailer (besides Walmart) for wet shave products during the period of January 1, 2007, to October 1, 2014, including but not limited to Your involvement in:

---

[7]Topic 10 seeks testimony about documents that P&G produced in response to a subpoena *duces tecum*. Because P&G produced no documents, the undersigned has not further considered this topic.

      a. Setting prices for these products;
      b . Analyzing historical, present, and future pricing data in that Category (including costs, profit margins, and competitor pricing);
      c. Marketing those products;
      d. Determining the stock levels, additions, deletions, carryover, and store placement for those products;
      e. Running promotions for those products;
      f . The information exchanged between You and each retailer as part of your service as a category advisor;
      g. Your actions taken or recommendations made as a category advisor to each retailer or in connection with each retailer's category advisor program; and
      h. The terms for your service as a category advisor to each retailer.

5. The nature and extent of any interactions between (a) Procter & Gamble employees serving as a category advisor to Walmart for the Wet Shave Category at any point during the period of January 1, 2007, to October 1, 2014, and (b) Procter & Gamble employees serving as a category advisor to any other retailer (besides Walmart) for wet shave products at any point during the period of January 1, 2007, to October 1, 2014.

6. The terms, rights, duties, safeguards, and rules governing Your service as a Walmart Category Advisor for the Wet Shave Category and/or your participation in Walmart's Category Advisor Program.

7. The practices, policies, and procedures to prevent violation of any laws, including the antitrust laws, that apply or applied to your service as a Walmart Category Advisor for the Wet Shave Category or your participation in the Category Advisor Program.

8. The monetary and nonmonetary compensation for your service as a Walmart Category Advisor for the Wet Shave Category, whether compensation to You or to Walmart.

9. Stiles or any product by Stiles.

2. **Plaintiffs' Failure to Show that Topics 1, 3, 6, 7 and 8 Could Not Be More Easily Obtained from Defendant Walmart**

Rule 26(b)(2)(C) requires a court to "limit the frequency or extent of discovery if…

the discovery sought is unreasonably cumulative or duplicative, or can be obtained from

11

some other source that is more convenient, less burdensome, or less expensive." P&G argues persuasively that this Court should quash the subpoena because Plaintiffs seek to impose an inordinate burden on a non-party to prepare and produce a Rule 30(b)(6) witness to testify about communications with the Defendant Walmart, when Plaintiff could have more easily obtained all of the requested information directly from the Defendant. Plaintiffs have failed to address this argument in their reply, and the undersigned finds it to be persuasive for Topics 1, 3, 6, 7 and 8.[8] The referenced topics all involve P&G's communications, acts, or payments and standards that involved Walmart and/or to which Walmart has access. As P&G points out, the exhibits attached to Plaintiffs' Memorandum in Opposition to the motion to quash confirm that Walmart employees are copied on the emails involving P&G. Plaintiffs do not make any claim that they could not have obtained the same information from the Defendant, and offer no explanation for seeking the information from a non-party rather than directly from the Defendant.

3. **Topics 2, 4, and 5 Are Overly Broad and Burdensome Considering P&G's Non-party Status and Plaintiffs' Claims**

Most topics in the subpoena seek information from P&G about its status as a "category advisor" to Walmart in the "Wet Shave" category of retail products. P&G protests that many of the topics do not sufficiently relate to the claims at issue in this case. The undersigned agrees.

---

[8] P&G includes Topic 2 among the topics that seek "information that is available directly from Walmart." However, Topic 2 seeks communications between not between P&G and Walmart, but between P&G and "any Walmart Category Advisor for the Wet Shave Category…from January 1, 2007, to October 1, 2014…." Not all information responsive to Topic 2 would necessarily be available from Walmart. However, the undersigned finds Topic 2 to be overbroad and unduly burdensome for other reasons.

12

The "Wet Shave" category includes all non-electric types of shavers as well as a myriad of accessories. (Doc. 17-3 at 143). In fact, all counsel agreed at the February 5 hearing that the "Wet Shave" and "Beauty" categories at Walmart encompass "thousands" of products that significantly differ from the specialized "styling razor" at issue in this lawsuit, including but not limited to gels and foams, aftershave, razor blades, razor handles, replacement heads, and cartridges. (*id.* at 144-145, 148). Counsel explained that "category advisors" provide advice to Walmart on a broad array of topics including display lighting and product placement as well as market trends.

In addition to the breadth of the general topic of being a "category advisor" in a "Wet Shave" category that encompasses thousands of products, P&G points out that - unlike the named Defendants AI and Walmart - Plaintiffs have not alleged that P&G produces *any* products within that category that directly compete with Plaintiffs' "styling razor." In their response in opposition to P&G's motion to quash, Plaintiffs assert that P&G was "one of Stiles' largest direct competitors who manufactured and sold disposable razor products." (Doc. 17 at 9).[9] However, Plaintiffs point to nothing in their complaint (or any evidence) that would suggest that P&G is a "direct competitor" of Stiles in the only relevant market at issue - the *styling* razor market. (*See* FAC at ¶ 79, defining relevant market as "Disposable Personal Styling Razors"; *id.* at ¶ 80, defining "distinct market from

---

[9]This portion of the statement in Plaintiffs' memorandum was redacted from the public version of the memorandum in opposition filed at Doc. 14. However, the undersigned does not believe that the quoted portion reveals any confidential information.

13

the general disposable razor market or from battery-operated razors or from a single type use razor, such as an eyebrow only, side shaving razor.")

Rather than pointing to evidence, Plaintiffs instead cite to an administrative antitrust complaint filed in February 2020 by the Federal Trade Commission that alleges, in part, that P&G and Edgewell have a longstanding "duopoly" in the broad disposable wet shave razor market. But Plaintiffs' citation to the FTC litigation is a red herring. The FTC complaint was filed to block the $1.37 billion acquisition of a competing brand, Harry's Inc., by Edgewell in that market. The FTC complaint has no relevance to the specialized "styling razor" market or to the patent and antitrust claims against Walmart and Stiles that are at issue here. In contrast to P&G's role, Plaintiffs have represented that Walmart and AI control 98% of the relevant "styling razor" market. (*See* FAC at ¶ 95, alleging that A1 has a large share of the relevant market). *Compare* FTC press release at https://www.ftc.gov/news-events/press-releases/2020/02/ftc-files-suit-block-edgewell-personal-care-companys-acquisition ("The complaint alleges that, for many years, Edgewell and Procter & Gamble operated their respective Schick and Gillette brands of men's razors, and Intuition/Hydro Silk and Venus brands of women's razors, as a comfortable duopoly characterized by annual price increases that were not driven by changes in costs or demand" and that the acquisition of Harry's, Inc. by Edgewell would eliminate a key competitor in the broad market of generic disposable razors).

P&G is not a Defendant in the underlying case and reasonably questions the relevance of the discovery sought from it. After all, Plaintiffs' FAC does not contain any

14

allegations against P&G or any allegations of horizontal price fixing. P&G argues that the subpoena should be quashed because it amounts to a "blatant fishing expedition seeking irrelevant information" relating to an unalleged conspiracy involving nonparties and new (but unpleaded) "per se" antitrust claims that are not included in the Fourth Amended Complaint. (*See* Doc. 6 at 16).

In fact, Plaintiffs admit that their latest assertions of horizontal price fixing support a new "per se" antitrust theory of liability as opposed to the existing "rule of reason" antitrust claims against the only two identified Defendants, Walmart and AI.[10] Notwithstanding the absence of such allegations in the FAC, Plaintiffs baldly assert that P&G is "at the center" of a "Wet Shave Cartel" that involved a "price fixing conspiracy [that] occurred under the auspices of Walmart's category management program" and that demonstrates a "per se violation of antitrust laws." (Doc. 17 at 2-3).[11] Plaintiffs maintain that the fact that the FAC does not actually include any such antitrust claims or references to the "category advisory program" does not matter because the California court has held such broad discovery is within the scope of the *existing* "rule of reason" antitrust claims against Walmart and AI.

---

[10]Previously, in an order granting Defendants' motion to dismiss Plaintiffs' antitrust claims before later allowing those claims to be re-asserted, the California court noted that "the only agreement alleged in the [complaint] is that Walmart – as a retailer – propositioned AI – as a manufacturer/supplier – to make a knock off of the Stiles Razor to be sold at Walmart under Walmart's brand, and AI agreed." (Doc. 101 at 7). The same agreement is alleged in the FAC. In a later order denying Defendants' motion to dismiss the re-asserted antitrust claims, the trial court distinguished the "rule of reason" antitrust claim that it understood Plaintiffs to be re-alleging from a "per se" antitrust violation.

[11]Plaintiffs used identical language to describe non-party Coty's role in response to a motion to quash filed in the Southern District of New York.

15

In support, Plaintiffs heavily rely upon recent trial court orders in which the California court partially overruled Walmart's objections to the scope of Walmart's Rule 30(b)(6) deposition. Plaintiffs urge this Court to follow the California court's "lead" as well as language in the trial court's March 6, 2020 Order that the remaining subpoenas must be "honored and enforced." (Doc. 17-3 at 438).[12] However, Plaintiffs' argument ignores the <u>critical</u> fact that Walmart is a party to the litigation, whereas P&G is not. In context, the California court's prior orders are easily reconciled with the view of this Court that the subpoena directed to P&G is *not* appropriately proportional to the claims at issue, based upon P&G's non-party status and the tangential and extremely limited relevance of the discovery sought from P&G to any of Plaintiffs' existing claims against either Defendant as compared to the burden forced upon P&G to prepare its corporate representative(s) to address such broad topics.

As previously discussed, the California trial record reflects numerous disputes, with extensive briefing.[13] At the February 5 hearing, the trial court noted with appreciation that the parties had narrowed their unresolved dispute to five topics of disagreement out of the original 32 topics served on Walmart. (Doc. 17-3 at 141; *see also id*. at 122).

One of the first issues addressed at the February 5 hearing was temporal scope; Plaintiffs had originally failed to offer any limits, but later agreed to time limitations that

---

[12]It is abundantly clear that, in context, the California court was speaking broadly about the ongoing dispute over depositions within its jurisdiction, and did not intend to rule on the enforceability of a subpoena served on a non-party in the Southern District of Ohio.

[13]For example, the parties' joint position statement of issues to be addressed at the January 15 hearing spanned 61 pages; their joint statement for the February 5 hearing spanned 39 pages.

Walmart still believed to be over-inclusive. Upon questioning by the trial court, Plaintiffs explained that even though they had not sold the Stiles Razor at Walmart over the entire span of years for which they sought discovery, Stiles was "negotiating" to sell at Walmart during some of those years, while over other years "Walmart was determining whether her product should go in the beauty accessories category, in the wet shave category or both because what she has effectively is a beauty razor." (*Id.* at 142). Reassured by Plaintiffs' ability to tie the temporal scope to the Defendant's decision-making in terms of its sales of the Stiles Razor and replacements to Plaintiffs' product after it discontinued those sales, the court allowed the relatively lenient timeframe.

Walmart also objected to several inquiries about its "category advisor" program as overly broad considering the "thousands of products" in the referenced categories. The specific topics on which Plaintiff sought testimony included Walmart's "category advisor program," (Topic 4); its "practices, processes and procedures for selecting category advisors," (Topic 5); and "use of category advisors, including what information is shared with category advisors." (Topic 6; *see generally* Doc. 17-3 at 122). The trial court again sought reassurance from Plaintiffs' counsel, noting "it does seem that your client would be more interested in those things that relate to Stiles within the category advisor program. I don't get the sense that what you're looking for is a tutorial on how the category advisor program works." (*Id.* at 146). Plaintiffs' counsel clarified that Plaintiffs were seeking *some* general information about Walmart's category advisor program, explaining that Plaintiffs only realized after reviewing documents that "the way that Walmart makes

17

its decisions is that it engages people from its largest suppliers to tell it about the market and give it advice on what new products should it take…[s]o we do want to know what's the category advisor program from Walmart's mouth but …*we don't want to be untethered from our client.*" (*Id.* at 147, emphasis added). The trial court overruled Walmart's objections to scope only *after* reassurances that questioning would be limited to the claims at issue. Still, the court expressly and repeatedly warned Plaintiffs that its ruling was "without prejudice to objections at the time of the deposition if the inquiries from plaintiff are going outside appropriate discovery insofar as *having no relevance to this matter or not appropriately proportional as Rule 26(b)(1) references*." (Doc. 17-3 at 150, emphasis added).

Plaintiffs now accuse P&G of "rehashing a series of arguments raised by Walmart that the district court in the Eastern District of California has already rejected." (Doc. 17 at 13). Arguably, the topics listed in the subpoena served upon P&G are *far* more expansive and detailed than the "tell me how your category advisor program works" inquiries sought from Defendant Walmart.[14] But even if that were not the case, the "proportionality" concerns for discovery of questionable relevance from a party differs from that which can be obtained from a non-party, for good reason. Unlike Walmart, P&G is not accused of violating Plaintiffs' patent to create and sell its own knock-off "styling

---

[14] As noted, the topics directed to Walmart were extremely general. When Walmart objected that one of the topics sought more detailed information concerning Walmart's "practices, processes and procedures *for sharing price, cost and supply information* with product suppliers," (Topic 7, emphasis added), the trial court readily agreed with Walmart that a request for such detailed information was overbroad and unduly burdensome, and instead construed the request as seeking only information on the "mechanics" of how Walmart shares information with product suppliers.

18

razor." Instead, Plaintiffs only recently have claimed (and notably <u>not</u> within any existing claim in the FAC) that P&G was involved in Walmart's allegedly illegal conduct through the advice that P&G provided to Walmart as one of several "category advisors" over the years.

Considering the context and P&G's status as a non-party, the undersigned concludes that Topics 2, 4 and 5 are all of such limited relevance to any claim that they would be unduly burdensome to P&G and not proportional to the claims at issue. Topic 2, for example, seeks a corporate representative to testify about communications between P&G and any other "Walmart Category Advisor for the Wet Shave Category" for "any" of the thousands of products in the Wet Shave Category for a nearly 8-year period, including communications "regarding any price, cost, add/delete/carryover decision, rollback, or store count for products." Topic 4 does not bother to narrow its scope to Walmart, but instead seeks extremely detailed information about P&G's alleged "role and the nature and extent of [its] participation as a category advisor to <u>any retailer</u> (besides Walmart)" over an 8 year period for thousands of wet shave products. Topic 4 also is unlimited to any geographic area, and includes international or domestic markets where the Stiles Razor was never marketed or sold. Topic 5 similarly seeks testimony about the "nature and extent of any interactions" between any P&G employees "serving as a category advisor to Walmart" and anyone who served as a similar "category advisor to any other retailer" over nearly 8 years. The scope of these requests is breathtaking. As P&G points out (and Plaintiffs do not dispute), the scope would include a P&G employee

who worked as a category advisor for Walmart having lunch with a P&G category manager for a product in Target's Wet Shave department. It would be virtually impossible for P&G to prepare any corporate representative to testify about the level of detail sought by Plaintiffs over a nearly 8-year time period.

4. **P&G Shall Comply with the Subpoena for Topic 9**

Although P&G has carried its burden to show that the subpoena should be quashed as unduly burdensome for most of the listed topics, P&G's motion is denied as to Topic 9 – any information that P&G may possess regarding Stiles or any Stiles product. To the extent that such testimony may overlap with or include information concerning P&G's participation as a Walmart Category Advisor in Walmart's Wet Shave program, such information would fall within the proper scope of discovery (as limited to Topic 9).

III. **Conclusion and Order**

For the reasons discussed, P&G's motion to quash (Doc. 6) is **GRANTED IN PART** as to all topics listed in the Notice other than Topic 9. As to Topic 9, P&G shall work with Plaintiffs' counsel to promptly reschedule the Rule 30(b)(6) deposition on or before May 22, 2020.[15]

*Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

---

[15] The Court again recognizes that due to the COVID-19 pandemic that this deadline may need to be extended. This Court will tie the deadline to take P&G's 30(b)(6) deposition to any extension of time given by the Court in California to complete the other depositions in that case.